**Keith SHORT and Fair Housing Justice Center, Inc.,**
Plaintiffs,

v.

**MANHATTAN APARTMENTS, INC.**
and Abba Realty Associates,
Inc., Defendants.

Case No. 11–cv–5989 (SC).

United States District Court,
S.D. New York.

Dec. 3, 2012.

Armen Hagop Merjian, Housing Works, Inc., Diane Lee Houk, New York, NY, for Plaintiffs.

David Christopher Wims, David Wims, Law Offices, Brooklyn, NY, Jay B. Itkowitz, Itkowitz & Harwood, New York, NY, for Defendants.

## MEMORANDUM OF DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

SAMUEL CONTI, District Judge.

## I. *INTRODUCTION*

This case involves allegations of housing discrimination against two New York City real estate brokers, Defendants Manhattan Apartments, Inc. ("MA") and Abba Realty Associates, Inc. ("Abba") (collectively, "Defendants"). Plaintiff Keith Short, a disabled man who is living with AIDS, solicited Defendants' services in an attempt to find a suitable rental apartment. Mr. Short and Plaintiff Fair Housing Justice Center, Inc. ("FHJC") (collectively, "Plaintiffs") claim that MA and Abba discriminated against Mr. Short after they learned that he intended to pay his rent with a subsidy from the New York City HIV/AIDS Services Administration ("HASA").

Plaintiffs bring four claims under the Fair Housing Act ("FHA"). Specifically, they assert claims against both MA and Abba under 42 U.S.C. §§ 3604(d), and (f)(1)–(2), and against Abba alone under 42 U.S.C. § 3604(c). All four of these FHA provisions prohibit discrimination on the basis of disability. Plaintiffs also assert claims for disability discrimination and source-of-income discrimination under the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8–107 *et seq.*

The Court held a four-day bench trial from October 15, 2012 through October 18,

2012.[1] By this Memorandum of Decision, the Court issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. As set forth below, the Court finds for MA and Abba on Plaintiffs' claims for disability discrimination under the FHA and NYCHRL, but finds for Plaintiffs and against both MA and Abba on Plaintiffs' claims for source-of-income discrimination under the NYCHRL.

## II. *FINDINGS OF FACT*

### A. *The Parties*

1. Defendant MA is a New York corporation located in Manhattan, New York. SF No. 8.[2] The primary business of MA is to broker the rental of apartments in New York City. SF No. 9. Jerry Weinstein is the sole owner of MA and holds a real estate broker's license issued by the State of New York. SF No. 10. Eighty to ninety percent of MA's business is real estate rentals; the remainder is real estate sales. Weinstein Test. The company currently works with over 500 major New York City landlords. *Id.* Currently, MA is one of the largest rental brokers in New York City, with approximately 1,000 rental listings at any given time in its centralized listings database. *Id.* About 150 licensed realty agents currently associate with MA as independent contractors. *Id.* Ninety-five percent of these agents work exclusively with MA. *Id.* In 2011, MA earned approximately $5 million in broker's fees. *Id.*

2. Defendant Abba is a New York corporation with offices located in Brooklyn and the Bronx, New York. SF No. 27.

The primary business of Abba is to broker the rental and sale of apartments and homes in New York City. SF No. 28. Sheina Levin is the sole owner of Abba and holds a real estate broker's license issued by the State of New York. SF No. 29. Abba works with about six licensed real estate salespeople, including Yisroel "Israel" Golowinsky, and employs three or four other individuals, including Carmen Peña and, during the relevant period, Mersedeh "Mercedes" Rofeim.[3] Levin Test.; SF Nos. 30, 31. Abba has been working with people with HASA subsidies since the inception of the HASA program. Levin Test. HASA clients currently represent a significant portion of Abba's business and Abba closes approximately 100 apartment rentals per year for renters with a HASA subsidy. *Id.* In 2011, Abba's gross revenue, all from broker's fees, was approximately $750,000 to $800,000. *Id.*

3. Plaintiff Keith Short was diagnosed with the human immunodeficiency virus ("HIV") in 1989. Short Test. The disease has since progressed and Mr. Short is now living with acquired immune deficiency syndrome ("AIDS") and a number of AIDS-related maladies. *Id.* The parties have stipulated that Mr. Short is a person with a disability within the meaning of the FHA and the NYCHRL. SF No. 1. Mr. Short is unemployed and has no savings or income. Short Test. Mr. Short moved to New York City from Washington D.C. in the late summer of 2010. *Id.* Soon thereafter, he applied and qualified for HASA rental assistance and took up residence in a Single Room Occupancy hotel ("SRO"), which was paid for by his HASA subsidy.

---

**1.** In accordance with the Court's order, the parties filed posttrial briefs. ECF Nos. 100 ("MA Br."), 101 ("Abba Br."), 102 ("Pls.' Br.").

**2.** On June 22, 2012, the parties filed a joint pretrial order with the Court in which they stipulated to a number of facts (hereinafter, "SF No(s). ___").

**3.** Ms. Rofeim left Abba in late August 2012. Levin Test.; Rofeim Test.

Mr. Short was unsatisfied with the SRO and began looking for a suitable apartment in or around September 2010. His apartment search brought him to Abba in October and November 2010 and to MA in January 2011. *Id.* Plaintiffs allege that Abba and MA discriminated against Mr. Short based on his disability and lawful source of income.

4. Short reported Abba and MA's alleged misconduct to Plaintiff FHJC in early 2011. *Id.* FHJC is a non-profit organization whose mission is to ensure that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities. SF No. 6. In response to Mr. Short's complaint, FHJC conducted tests in early 2011 in an attempt to determine whether Defendants would rent apartments within the price range allowed by HASA to unemployed, disabled individuals with a HASA housing subsidy. Freiberg Test.[4]

### B. *The HASA Rental Assistance Program*

5. Plaintiffs called Catherine Bowman, the director of South Brooklyn Legal Services, to testify about HASA's organization and the administration of the HASA rental assistance program. Ms. Bowman regularly works with HASA clients and deals with the HASA rental assistance program on a daily basis. Bowman Test. Prior to working for South Brooklyn Legal Services, Ms. Bowman worked as a case manager for the city agency that was formerly charged with carrying out HASA's mission. *Id.* In light of Ms. Bowman's experience, the Court finds her testimony on the HASA rental assistance program to be credible.

6. HASA is a division within the New York City Department of Social Services created to address the needs of persons in New York City living with a clinical/symptomatic HIV illness. *Id.* To be eligible for HASA assistance, a person must be HIV-positive and exhibit certain symptoms associated with AIDS. *Id.* HASA provides such persons with intensive case management services as well as transportation, nutrition, and shelter allowances. *Id.;* NYC Admin. Code §§ 21–127, 21–128. HASA currently has a caseload of 45,000— 32,000 of these individuals have HIV/AIDS and the rest are dependents. Bowman Test.

7. Housing is especially important for persons with symptomatic AIDS because their compromised immune systems leave them susceptible to a variety of other illnesses. *Id.* As Ms. Bowman testified: for people with AIDS, "housing is healthcare.... People who aren't housed tend to not get any medical care and they die very quickly."

8. New York State regulations provide a rental enhancement of up to $480 per month for public assistance recipients with AIDS. *Id.* Such persons may also receive up to $330 per month for each additional member of their household. *Id.* HASA provides an additional enhancement for its clients because housing in New York City tends to be more expensive than in the rest of the state. *Id.*

9. Single HASA clients who earn no income generally receive about $1,100 per month for shelter from the city and state combined. *Id.* Their eligibility for rental assistance is not contingent on "workfare"

---

**4.** Fred Freiberg, FHJC's executive director and field services director, testified as a witness for Plaintiffs. Mr. Freiberg has been involved in investigative testing for decades and previously directed national testing programs for the United States Department of Justice. Friedberg Test. He has supervised and participated in thousands of tests. *Id.*

or any other type of employment requirement. *Id.* Thus, New York City generally guarantees 100 percent of a HASA client's rent, regardless of the client's financial situation. *Id.*

10. In Ms. Bowman's experience, there have been very few instances in which HASA has been late in making rental payments to landlords over the last several years. *Id.* On occasion, Ms. Bowman has seen delays in processing rental increases, e.g., after a landlord increases a HASA client's rent, the city will continue to pay the old rental rate. *Id.* Ms. Bowman testified that these mistakes are generally corrected in a timely manner. *Id.*

11. Through April 1, 2011, Mr. Short, as a HASA client was entitled to have a broker's fee, security deposit, and first-month's rent paid by HASA upon securing an apartment. SF No. 5. Mr. Short was also entitled to a rental subsidy of about $1,100 per month. Short Test; Bowman Test. All of these fees were to be paid in cash. Bowman Test.

12. Sometime after April 1, 2011, there was a change in HASA's policies regarding broker's fees and security deposits. *Id.* As a result of that change, HASA now pays only half of their clients' broker's fee and pays for security deposits with vouchers. *Id.* These changes took effect after Mr. Short concluded his dealings with Abba and MA. At trial, Abba's counsel repeatedly insisted that HASA also does not allow its clients to enter leases with preferential rent riders.[5] However, Ms. Bowman credibly testified otherwise. The Court finds

that HASA generally does not prohibit preferential rent riders.

13. HASA must approve a client's apartment before paying that client's shelter allowance or security deposit. *Id.* Generally, a HASA client will sign a lease and then submit information to HASA for review. *Id.* The approval process generally involves a review of the lease and a site visit to the apartment. *Id.*

14. Since 1997, the New York City Council has required HASA (and its predecessor agencies) to make an approval determination no later than twenty business days following the submission of all required information and documentation by the HASA client. *Id.*; N.Y. City Admin. Code § 21–128(c)(2). In Ms. Bowman's experience, HASA complies with the twenty-business-day requirement most of the time, and, in emergency cases, HASA will process an application in seventy-two hours. Bowman Test.

15. HASA may decline to approve an apartment for any number of reasons, including code violations in the unit or the building or a rental rate that exceeds the HASA client's rental allowance. Bowman Test.; Levin Test. HASA may also reject certain walk-up apartments that are difficult for a HASA client to reach. Bowman Test.; Levin Test. In Ms. Bowman's experience, HASA infrequently rejects apartments with rents that fall under HASA's shelter allowance. Bowman Test.

16. Due to the amount of time that it takes for HASA to approve a client's apartment lease, a HASA client is general-

---

**5.** Under New York City law, landlords are free to lease a property for a "preferential rent," i.e., a rent lower than the rent stabilized rate. Levin Test. New York City has taken the position that once a landlord charges a tenant a preferential rent, the tenant's future rent will be based on that lower amount. *Id.* However, a preferential rent can be limited to a specific period of time if the lease provides for such a limitation, e.g., through a preferential rent rider. *Id.* There is no indication that any of the apartments at issue in this case had a preferential rent or a preferential rent rider. Indeed, Ms. Levin testified that she has only seen three such leases in connection with HASA clients.

ly unable to put down a security deposit or start paying rent immediately after finding a suitable apartment. Bowman Test.; Levin Test. However, HASA will pay any rent which accrues prior to approval. Bowman Test. For example, if a lease term commences on January 1 and HASA does not approve the lease until February 1, HASA will pay the January rent retroactively. *See id.* However, if a lease commences on January 1 and HASA ultimately rejects the apartment, the landlord of that apartment may not be able to recover for the January rent. *See* Bowman Test.; Levin Test. Thus, landlords assume some measure of financial risk in agreeing to a lease prior to HASA approval. *See* Levin Test. This risk can be mitigated where the HASA client finds an apartment well before the commencement of the lease term. Ms. Bowman testified that HASA clients' lease terms generally begin sometime after they submit their lease to HASA for review.

### C. *FHJC Testing*

17. In or around January 2011, Mr. Short reported Abba and MA to the FHJC. Short Test. In response, the FHJC conducted telephone and in-person tests at MA and Abba using four fair-housing covert testers, Amanda Boekelheide, Susan Burns, Dan Burkarth, and Brian Hickey (collectively, "the FHJC testers"). Freiberg Test. The FHJC testers are professional actors and were paid by FHJC for their services. *Id.;* Boekelheide Test.; Burns Test.; Burkarth Test; Hickey Test.

18. Testers are individuals who pose as renters or homebuyers, generally under assumed names, for the purpose of obtaining information about the conduct of landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place. Friedberg Test. The FHJC testers received training on how to conduct a test, prepare a test report, and use a concealed digital audio recording device to record conversations during the test. *Id.*

19. The FHJC testers inquired about listings that the Defendants had advertised. *Id.* The FHJC could not identify the landlords associated with these listings since the advertisements generally did not include such information. *Id.* Further, the listings generally did not identify the apartment number or even the exact address of the property for rent. *Id.*

20. The FHJC testers recorded their conversations with MA and Abba's agents using digital audio recording devices.[6] Boekelheide Test.; Burns Test.; Burkarth Test; Hickey Test. MA and Abba have stipulated that these audio recordings accurately reflect the testers' conversations with Abba and MA's agents. SF Nos. 14, 19, 22, 26, 34, 39, 42, 45.

21. FHJC staff prepared written assignment forms for each tester, reviewed the testers' recordings and reports, and prepared a summary of the information obtained by each tester. Friedberg Test. at 51. The FHJC Board of Directors met with FHJC staff and legal counsel to determine what steps to take in response to the information collected by the testers. These activities diverted FHJC staff from spending time on other activities and caused FHJC to incur the cost of staff time devoted to responding to Mr. Short's complaints regarding MA and Abba in the total amount of approximately $5,000— $2,500 for each defendant. Pls.' Ex. 36; Friedberg Test. at 55–56.

---

**6.** The FHJC testers' audio recordings were admitted into evidence as Plaintiffs' Exhibits 19–23, 27–32.

### D. *Facts Relating to Abba*

22. In October 2010, after contacting a number of other brokers, Mr. Short called Abba's Brooklyn office. Short Test. Mr. Short told Abba's receptionist that he was a HASA client, and he was transferred to Ms. Rofeim, an Abba employee whose broker's license expired in or around 2005. *Id.;* Rofeim Test.

23. Ms. Rofeim informed Mr. Short that, before she could tell him about available apartments, he would need to come to the office; complete an application; bring certain documents to the office, including his social security card, driver's license, and HASA award letter; and pass a credit check. Short Test. Mr. Short later brought the requested information to Abba's office without objection. *Id.* After reviewing this information, Ms. Rofeim agreed to show Mr. Short available apartments. Rofeim Test.; Short. Test.

24. On a subsequent visit to Abba's office, Mr. Short noticed in the office window multiple listings for apartments that were attractive to him and within his price range of around $1,100 per month. Short Test. When Mr. Short asked Ms. Rofeim about the listings, she informed him: "[T]hose apartments are not available for people on programs. They're only for people who are working people." *Id.*

25. Mr. Short wanted a second opinion about the listings in the window and asked Carmen Peña about them. *Id.* Ms. Peña had worked at Abba for approximately four years as "the closer," i.e., the person responsible for preparing leases and handling contacts with the landlords and clients to complete apartment rentals. Levin Test.; Peña Test. Ms. Peña informed Mr. Short that the landlords of those apartments did not accept HASA and that those apartments were only for working people. Short Test. Ms. Peña continued: "some apartments are for working people . . . and some are for program people." *Id.* After these conversations with Ms. Rofeim and Ms. Peña, Mr. Short did not inquire further about the listings in the window. Short Test.

26. Relying on Ms. Levin's testimony, Abba contends that the listings in the window were unavailable at the time Mr. Short inquired about them. The Court does not find this contention credible. Ms. Levin testified that the advertisements in the window "were changed very infrequently" and "a lot" of the advertisements were "just buildings." Levin Test. at 14. However, there is no indication that Ms. Levin had any direct knowledge of Mr. Short's conversations with Ms. Peña or Ms. Rofeim or that she was familiar with the apartments that they had discussed.[7] Further, Ms. Levin did not testify that the listings advertised in the window were never available to rent. Rather, when asked whether the advertised apartments were "available for rent in the regular course of business," she answered "not necessarily." *Id.*

27. Abba ultimately showed Mr. Short four apartments. *Id.* Mr. Short testified that he found two of these apartments unacceptable because he did not feel that he could "make [them] into his home." One of the unacceptable apartments was unfinished at the time Mr. Short viewed it and the other had a layout which Mr. Short found undesirable. *Id.*

28. The first "acceptable" apartment Abba showed Mr. Short was located on or around Twenty–First Street in Brooklyn, New York. *Id.* Mr. Short applied for the apartment and was approved by the land-

---

**7.** At trial, neither Ms. Rofeim nor Ms. Peña disputed Mr. Short's account of their conversation concerning the apartment listings posted in Abba's office window.

lord. *Id.* However, before HASA could approve the apartment and Mr. Short could finalize the deal, the landlord rented it to another prospective tenant who paid cash immediately. *Id.* After Mr. Short lost the Twenty–First Street apartment, Abba continued to work with Mr. Short.

29. The second "acceptable" apartment Mr. Short found through Abba was located on Newkirk Avenue in Brooklyn, New York. *Id.* The landlord approved Mr. Short for the apartment, HASA approved the apartment for Mr. Short, and the landlord and Mr. Short signed a lease.

30. Around the time that Mr. Short signed the lease, he also signed a statement certifying that he had seen the Newkirk Avenue apartment, that it was in "good condition," and that the "landlord ha[d] done all necessary repairs." Abba Ex. D; Short Test. Mr. Short testified that the Newkirk Avenue apartment was in good condition when he signed this statement.

31. There is some dispute about what happened next. Ms. Rofeim testified that Mr. Short got into a verbal altercation with the building superintendent and changed his mind about the apartment. Mr. Short testified that the apartment was in an "unlivable" condition on his move-in day. According to Mr. Short, the floor was covered in a "carpet[ ]" of dead and dying roaches, the stove was disconnected from the wall, the refrigerator was "caked with filth" and roaches were coming out of the freezer door, wires were hanging from the ceiling, and an electrical socket had fallen off the wall and was melted to the floor. Short Test. Mr. Short also testified that he called Ms. Peña about the apart-

ment's condition and Ms. Peña then contacted the superintendent. Soon thereafter, the superintendent allegedly entered the apartment and, without provocation, began screaming epithets at Mr. Short. Short Test. The Court does not find Mr. Short's testimony about these events to be entirely credible.[8]

32. Mr. Short did not move into the Newkirk Avenue apartment and, though it is unclear from the evidence adduced at trial, it appears that his lease agreement for the unit was somehow rescinded. Mr. Short did not view any more apartments with Ms. Rofeim or anyone else from Abba. Short Test.; Rofeim Test.

33. Several months later, the FHJC commenced its testing at Abba. On January 24, 2011, Ms. Boekelheide, one of the FHJC testers, called Abba looking for a one-bedroom apartment for rent for up to $1,100 per month. Boekelheide Test.; Pls.' Ex. 27. Ms. Boekelheide spoke with Abba's agent, Yisroel Golowinsky, who informed her that Abba had a one-bedroom apartment for $1,100 per month available immediately. SF No. 31; Pls.' Ex. 27. The apartment was located on "Saint Marks and Kingston" in the Prospects Heights area of Brooklyn, New York. Pls.' Ex. 27. Mr. Golowinsky offered to show Ms. Boekelheide the Saint Marks apartment that day and informed her that he would make himself available that evening to show the apartment if she wanted to view it immediately. *Id.*

34. Later that same day, January 24, 2011, Ms. Boekelheide called Mr. Golowinsky again and told him that she was no longer interested in the Saint Marks apartment, but her disabled brother, a

---

8. Even if Mr. Short's account were true, Abba could not be held liable for the incident. There is no evidence that Abba was responsible for cleaning or repairing the apartment, which was in good condition when Mr. Short initially viewed it. Additionally, Plaintiffs stipulated at trial that the building's superintendent was not connected to Abba in any way.

HASA client, might be. Pls.' Ex. 28. Mr. Golowinsky informed Ms. Boekelheide: "Um, me personally, I don't deal with that. But there is someone who does deal with that." He then told Ms. Boekelheide to call Abba back and ask for Ms. Rofeim, adding: "She's the agent that deals with the HASA program." *Id.* Ms. Boekelheide also asked Mr. Golowinsky if the Saint Marks apartment would be available to a HASA client. *Id.* Mr. Golowinsky responded that he was not sure how the HASA program worked, and again suggested that Ms. Boekelheide deal with Ms. Rofeim. *Id.* Abba has stipulated that, on January 24, 2011, Abba had one-bedroom apartments available to rent in the price range of $1,100 per month. SF No. 36.

35. Later on January 24, 2011, Ms. Boekelheide called Abba, per Mr. Golowinsky's instructions, and spoke with Ms. Rofeim. Pls.' Ex. 29. Ms. Boekelheide explained that she was inquiring on behalf of her brother, a HASA client. *Id.* Ms. Boekelheide inquired whether the Saint Marks apartment was available, Ms. Rofeim said: "No, I have to, I have to see what, you know, what I have available. If it's a one-bedroom or not. So that's why let him come see me. My name is Mercedes. And he can bring me all his paperwork. Meaning the, eh, HASA award letter. Or the budget letter. Plus the SSD, the disability budget letter. I, I need the social security card. And a photo ID." *Id.* Ms. Rofeim continued: "When he comes in, I'll run his credit. If everything is good, then I'll tell him what I have available...." *Id.*

36. Later that day, Ms. Boekelheide called Ms. Rofeim again, and again inquired about the one-bedroom apartment on St. Marks Street, asking if the landlord accepted HASA. Pls.' Ex. 30. Ms. Rofeim responded: "[L]et me find out—I don't know, but, uh, in either case your brother

would have to come see me with all the paperwork." *Id.* Ms. Rofeim added: "But I can't do anything until I meet him and until I see all the paperwork." *Id.* Ms. Boekelheide then asked: "So, some of the properties you have do take [HASA] and some don't?" *Id.* Ms. Rofeim responded: "Yes, yes, yes." *Id.*

37. FHJC sent another tester, Mr. Burkarth, to Abba on March 31, 2011. Friedberg Test. Mr. Burkarth spoke with Mr. Golowinsky and said he was looking to rent an apartment before May 1, 2011 for under $1,200. Pls.' Ex. 31. Mr. Golowinsky asked Mr. Burkarth about his credit and income. *Id.* Mr. Burkarth responded that his credit was "good" and that his annual income was around $41,000. *Id.* Upon hearing this, Mr. Golowinsky immediately responded that he had a one-bedroom apartment available for $1,100 on St. Marks Avenue and New York Avenue and it was available "right away." *Id.* Mr. Golowinsky then showed Mr. Burkarth photographs of the apartment, drove Mr. Burkarth to an apartment at 762 Saint Marks Avenue, and showed Mr. Burkarth the property, without first running a credit check or requiring any proof of income. *Id.*; Burkarth Test; Pls.' Ex. 15.

38. Also on March 31, 2011, about one and a half hours after Mr. Burkarth left, another FHJC tester, Ms. Burns, went to Abba's office. Burns Test.; Pls.' Exs. 32. Ms. Burns explained to a woman, presumably Abba's receptionist, that she was inquiring on behalf of her son about a one-bedroom apartment advertised on Craigslist for $1,100 per month. Pls.' Exs. 16, 32. While the advertisement did not include an exact address, Pls.' Ex. 16, Ms. Levin testified at trial that the advertisement was for an apartment located at 762 Saint Marks Avenue, the same address that Mr. Burkarth visited with Mr. Golow-

insky. Levin Test. at 21–22; *see also* Pls.' Ex. 15.

39. Ms. Burns told Abba's receptionist that her son had HIV and that he was with the HASA program. Pls.' Ex. 32. The receptionist then directed Ms. Burns to Ms. Rofeim. Ms. Burns asked Ms. Rofeim if the apartment at 762 Saint Marks Avenue was still available or if "there are more like them." *Id.* Ms. Rofeim responded: "This is not for program." *Id.* Ms. Rofeim later informed Ms. Burns that she could not show her son apartments until she ran his credit. *Id.* Ms. Burns then explained that "HASA will pay [rents] up to eleven-fifty [$1,150]," to which Ms. Rofeim responded: "It doesn't matter. Because nowadays the landlords have had so much grief from HASA client, that a lot of them don't even want to accept this program ... But willing to do it if they see client is good." *Id.*

40. After checking further, Ms. Rofeim informed Ms. Burns: "No. I don't have it [the apartment at 762 Saint Marks Avenue] so this is out.... This is probably for working [people]. I'll find out." *Id.* Ms. Burns later informed Ms. Rofeim that "Ava" was listed on the Craigslist advertisement. Ms. Rofeim responded: "So call Ava. But I'm telling you, this is not for program." *Id.*

41. Abba argues that Ms. Levin's "undisputed" testimony shows that the apartment at 762 Saint Marks Avenue was not available for rent at the time Ms. Burns inquired about it. Specifically, Ms. Levin testified that the apartment at 762 Saint Marks Avenue was rented on March 31,

2011, the same day that Ms. Burns visited Abba and Mr. Burkarth saw an apartment at 762 Saint Marks Avenue with Mr. Golowinsky. Even if Ms. Levin's assertion is true (and the Court has doubts about this aspect of her testimony) Ms. Levin did not say what time the apartment went off the market.[9] To the extent that Ms. Levin's testimony can be construed to mean the apartment at 762 Saint Marks Avenue was rented before Ms. Burns inquired about it, Ms. Levin's testimony is directly contradicted by the FHJC audio recording. The recording indicates that Ms. Rofeim looked up the apartment when Ms. Burns was in Abba's office and determined, not that it had been rented to someone else, but that the apartment was "not for program." Accordingly, the Court finds that the apartment at 762 Saint Marks Avenue was available to rent when Ms. Burns inquired about it.

42. During their March 31, 2011 meeting, Ms. Rofeim told Ms. Burns that she wanted to see Ms. Burns' son: "And it would be nice if I could physically see him.... Because I—I need to see what he looks like, you know...." Pls.' Ex. 32.

43. Abba has stipulated that on March 31, 2011, the day that Mr. Burkarth and Ms. Burns visited Abba's offices, Abba had one-bedroom apartments available to rent in the price range of $1,100 per month. SF No. 47.

44. At trial, Abba introduced additional evidence concerning its general policies and practices for dealing with HASA and other government rental subsidies. Ms. Levin testified that Abba agents were not

---

**9.** Notably, Abba did not lay any foundation for Ms. Levin's testimony. It is not clear how she knew or possibly remembered when this particular apartment was rented. The only relevant document that Ms. Levin was shown on this issue at trial was Abba's advertisement, Pls.' Ex. 16, which has no information

concerning when the apartment was rented. During cross-examination, Ms. Levin stated that she had reviewed certain records to determine whether the apartment was "fee" or "no-fee," but she did provide any further foundation testimony. Levin Test. at 27.

restricted from working with HASA clients, but that "[HASA] clients will be directed for the most part to Mercedes [Rofeim]." Ms. Levin later explained that Ms. Rofeim had experience in the area and had developed a "niche" in terms of working with HASA clients. *Id.* Ms. Rofeim testified that 90 percent of her clients were on HASA or some other type of government assistance program. Rofeim Test.

45. Ms. Levin testified that: "If Mercedes [Rofeim] is speaking to the [HASA client] first over the phone, she will ask them to come in with documentation such as social security card, identification, and proof of their source of income … so that she can get the process going a little bit faster." Levin Test. Ms. Rofeim explained that she insisted on seeing HASA clients in person so that she could determine whether they were healthy enough to manage the stairs in a walk-up apartment. Rofeim Test. She also suggested that this process saved HASA clients multiple trips to Abba's offices. *Id.*

46. Ms. Levin also testified that Abba had a different process for working with rental applicants who were not on HASA or another form of government assistance. Levin Test. These applicants were also required to submit identification and proof of their source of income as part of the application process. *Id.* However, it did not "make a difference" whether such materials were submitted before or after these applicants looked at apartments. *Id.* Ms. Levin indicated that these customers consummated rental deals much more quickly than HASA clients, typically in a few days. *Id.*

47. Ms. Levin and Ms. Rofeim indicated that many of the landlords with whom Abba works do not accept HASA rental subsidies. Levin Test.; Rofeim Test. Throughout trial, Abba's counsel repeatedly argued that landlords do not want to work with HASA clients because of the delays in processing HASA applications and HASA's new policies concerning security deposits, broker's fees, and preferential rent riders. *See* Findings of Fact ("FF") *supra* ¶ 12. However, counsel's arguments are not evidence and Ms. Levin's testimony concerning landlords' preferences primarily consisted of hearsay and speculation.

48. Ms. Levin also indicated that Abba has no written policies or procedures regarding housing discrimination; does not provide its agents and employees with training about housing discrimination law; did not provide them with any training or instruction after the New York City Council passed the new source-of-income discrimination law in 2008; and, after this lawsuit was filed, did not provide any direction about housing discrimination or modify its practices. Levin Test. at 24.

### E. *Facts Related to MA*

49. On January 4, 2011, Mr. Short called MA's offices to inquire about an apartment that MA had advertised on Craigslist. Short Test. Mr. Short was transferred to Mr. Salsberry, a licensed real estate broker and an agent of MA. *Id.*; SF No. 11. Mr. Salsberry told Mr. Short that MA had "plenty" of one-bedroom apartments for rent in Mr. Short's price range of around $1,100 per month. Salsberry Test.; Short Test. At that time, Mr. Short did not inform Mr. Salsberry or anyone else at MA that he was a HASA client or that he was disabled. Salsberry Test.; Short Test.

50. The following day, January 5, 2011, Mr. Short met with Mr. Salsberry at MA's offices. Salsberry Test.; Short Test. When Mr. Short revealed that he was a HASA client, Mr. Salsberry said that he could not help him because the landlords with whom MA worked did not accept

programs. Salsberry Test.; Short Test. Mr. Short asked Mr. Salsberry which landlords did not accept programs, to which Mr. Salsberry responded: "All of them, 100 percent." Short Test.; Salsberry Test. Mr. Short took Mr. Salsberry at his word and did not inquire any further. Short Test.

51. At trial, Mr. Salsberry credibly testified that, based on his training at MA, he understood that he could not assist Mr. Short. Specifically, Mr. Salsberry testified that he understood an applicant could only qualify for an apartment listed by MA if he or she earned forty times the monthly rent or had a guarantor that earned eighty times the monthly rent. Mr. Salsberry was not aware of any exceptions for persons with government rental subsidies, such as Mr. Short. Salsberry Test. Mr. Salsberry also understood that the landlords, not MA, set out these requirements. *Id.*

52. Mr. Salsberry's understanding of MA's policies was corroborated by Mr. Weinstein's testimony at trial, as well as MA's training manual, which states: "Usually an applicant must earn 40–50X the monthly rent. . . . If the applicant is a student or does not earn enough to qualify for the apt, a guarantor will be needed. The guarantor must earn 80–90X the monthly rent." Pls.' Ex. 47 at 16.

53. Several months after Mr. Short's visit, the FHJC commenced testing at MA. On January 24, 2011, Ms. Boekelheide, who had also tested at Abba, telephoned MA and spoke with Mr. Salsberry. Boekelheide Test. Ms. Boekelheide told Mr. Salsberry that her name was Stacy Smith, that she was employed by New York University, and that she was looking for an apartment to rent for around $1,100 per month that was available as soon as possible. Pls.' Ex. 19. Mr. Salsberry informed her: "I have a ton, I have a lot of apart-

ments . . . quite a few I can show you. . . . I have stuff that's available now. . . . It's just a matter of when you could come in." *Id.*

54. Later that same day, Ms. Boekelheide called Mr. Salsberry again to say that she had found an apartment, but was now looking on behalf of her brother, a man with a disability who received a housing subsidy from HASA. Pls.' Ex. 20. Mr. Salsberry informed her: "[A]t the time right now I don't have any . . . landlords that accept, uh, the vouchers. . . . [W]e deal with most of the major landlords and they don't really accept those. . . . Most of the smaller ones do." *Id.*

55. Mr. Salsberry testified at trial that, at the time he spoke with Ms. Boekelheide, it was his understanding that none of the landlords who worked with MA would take an individual on a government program. The parties have stipulated that, on January 24, 2011, Mr. Salsberry knew of one-bedroom apartments available to rent in the price range of $1,100 per month and that such apartments could be found in MA's listings database. SF Nos. 15, 16.

56. Mr. Salsberry also testified that during his time at MA, he fielded several other calls from persons with government rental subsidies. He told these persons that he did not know if there were landlords that MA worked with that would accept a program and that he would get back to them. Salsberry Test. Mr. Salsberry did not follow-up with any of these individuals. *Id.*

57. On April 1, 2011, Ms. Burns, another tester employed by FHJC who also tested Abba, visited the offices of MA and met with Juanita Garcia–Meadows, another agent of MA. SF No. 11. Ms. Burns explained that she was looking for a one-bedroom apartment on behalf of her son in the Inwood/Washington Heights area of

Manhattan in the price range of $1,100 to $1,150 per month. Pls.' Ex. 21. Ms. Burns told Ms. Garcia–Meadows that her son was disabled and was not working and that he was receiving Social Security Disability income and was a HASA client. *Id.* Ms. Garcia–Meadows informed Ms. Burns: "The only thing with HASA is that I have to find a landlord who's gonna take that.... It's a government voucher and ... they have their own way of paying for the apartment. So I have to find a landlord that takes the program. Okay. So let me find out." *Id.*

58. Ms. Garcia–Meadows then began typing on her computer, informing Ms. Burns: "Yeah, so far, the landlords ... that we have here are not, um, affiliated with the HASA program." Garcia–Meadows Test.; Pls.' Ex. 21. Later, she stated: "There's some that are.... They do take Section 8, so I'm gonna find out if they do take the HASA." She then announced: "Unfortunately, right now, we don't have [any landlords who rent to HASA clients.]" Pls.' Ex. 21. When Ms. Burns inquired whether Ms. Garcia–Meadows meant in the area in question or in general, Ms. Garcia–Meadows responded: "In general." *Id.* MA has stipulated that, on April 1, 2011, Ms. Garcia–Meadows knew of one-bedroom apartments available to rent for less than $1,200 per month. SF No. 23.

59. At trial, Ms. Garcia–Meadows admitted that her computer search on behalf of Ms. Burns was a subterfuge. Garcia–Meadows Test. She testified that she only pretended to search because she knew that she would not be able to find any landlords at MA that would accept an applicant with a government subsidy. *Id.* Ms. Garcia–Meadows had checked with MA's listing department on ten to twenty prior occasions, and each time the listings department informed her that none of MA's landlords accepted government programs. *Id.*

60. At the conclusion of their meeting, Ms. Garcia–Meadows informed Ms. Burns: "If something comes up, I'll get back to you. Yeah, because, um, I have to find out who accepts the program. Yeah, which landlord is, uh, accepting." Pls.' Ex. 21. However, no one from MA, including Ms. Garcia–Meadows, ever called Ms. Burns back. Garcia–Meadows Test.

61. On April 1, 2011, the same day that Ms. Burns spoke with Ms. Garcia–Meadows, Brian Hickey, another FHJC tester, also visited MA. Pls.' Ex. 22. Mr. Hickey stated he was looking for a one-bedroom apartment under $1,200 a month in Manhattan and was directed to Angela Fernandes, another agent of MA. *Id.* Mr. Hickey indicated that he earned $41,000 a year. *Id.* Mr. Hickey never indicated that he was disabled or that he intended to use government assistance to pay his rent. *Id.* Ms. Fernandes showed Mr. Hickey listings and photographs of typical one-bedroom apartments in Manhattan that were available in his price range and offered to show Mr. Hickey the apartments. *Id.;* Hickey Test. Ms. Fernandes asked about Mr. Hickey's employer, salary, assets, and job, among other things, and explained the fees required. After this meeting, Ms. Fernandes called Mr. Hickey twice to follow up and suggest dates on which to view available apartments. Pls.' Ex. 23.

62. As a discovery sanction against MA, the Court has designated the following fact: From July 1, 2010 through June 30, 2011, MA's rental listing database included directives from multiple landlords that MA not assist clients with governmental housing subsidies in applying for or renting multiple apartments listed, advertised, shown, and/or closed by MA on behalf of those landlords.

63. The evidence adduced at trial indicates that MA generally did not alter, amend, or question such directives from

landlords. When asked whether MA had the authority to waive or alter landlord requirements for rentals, Mr. Weinstein initially responded: "No, not at all." Weinstein Test. at 15. Mr. Weinstein later backtracked, testifying that certain rental criteria, such as a prospective tenant's employment status, "might be open to discussion." *Id.* at 40. In light of Mr. Weinstein's earlier testimony, this statement is not credible. The statement is also undermined by the testimony of Mr. Salsberry, Ms. Garcia–Meadows, and the audio recordings of the FHJC testers.

64. Mr. Weinstein also indicated that MA has no written policies and procedures regarding housing discrimination and does not provide its brokers and salespersons with any training regarding housing discrimination. Weinstein Test. Some of MA's agents may receive such training through outside, continuing-education courses, while others may not. For example, Mr. Salsberry testified that, as part of his licensure requirements, he attended continuing-education courses which covered fair-housing topics. However, Mr. Weinstein is no longer required to take such courses, and he has not personally attended any training on housing discrimination laws in the last ten years. *Id.* at 32.

65. Mr. Weinstein, Mr. Salsberry, and Ms. Garcia–Meadows were not aware of New York City's source of income law prior to the filing of this lawsuit. Weinstein Test.; Salsberry Test.; Garcia–Meadows Test. MA did not implement any changes to its policies or procedures after the filing of this lawsuit. Weinstein Test.; Salsberry Test.

### F. *Mr. Short's Injuries*

66. Mr. Short claims that Abba's actions caused him emotional distress. He testified: "I felt that I was being relegated to a lower status. It was very hurtful. I felt denigrated and shamed and I did not feel that I was valued at all as a prospective tenant." Short Test. at 69.

67. Mr. Short claims that MA's refusal to assist him caused him further emotional distress. He testified: "I felt discouraged. I felt humiliated. . . . And I just got through going to Abba a few months earlier having that horrible situation and then to deal with [MA] on top of it just categorically denying me any access. . . . It was discouraging. . . . I felt depressed. I felt hurt." *Id.* at 81.

68. After his experience with Abba and MA, Mr. Short continued to live in an SRO that was provided for and funded by HASA. Short Test. Mr. Short testified that the conditions at the SRO were unsanitary. Trash was left in the hallways and Mr. Short had no access to cooking facilities and was required to use a dirty, communal bathroom. *Id.*

69. Mr. Short continued to look for housing after his experience with Abba and MA. *Id.* at 84. As part of his apartment search, Mr. Short walked around neighborhoods, visited real estate agencies, and browsed listings on various websites, including Craigslist. *Id.* Mr. Short testified that this was a frustrating experience since he was repeatedly told that "there's nothing available for program people." *Id.* Mr. Short estimates that he spent four to five days per week looking for a suitable apartment during this period. *Id.*

70. Mr. Short eventually found a suitable apartment in the Bronx, New York, in or around June 2011. *Id.* at 82. HASA pays the entire rent and also covered the security deposit. Id.

### III. *CONCLUSIONS OF LAW*

Plaintiffs bring four claims against Defendants under the FHA, specifically under 42 U.S.C. §§ 3604(c), 3604(d),

3604(f)(1), and 3604(f)(2). Plaintiffs also bring claims against Abba and MA under the NYCHRL, N.Y. City Admin. Code § 8–107(5)(c). The thrust of these claims is that both Abba and MA discriminated against Mr. Short based on his disability and lawful source of income. Plaintiffs claim that MA's liability arises from its refusal to show apartments to prospective renters who are not working because of a disability. Pls.' Br. at 1. With respect to Abba, Plaintiffs assert that the realtor operates a "manifestly discriminatory, segregated system" by (1) "screen[ing] clients who are disabled and in receipt of a HASA housing subsidy from many of its listings," and (2) "only inform[ing] applicants with HASA of the apartments they are allowed to see … after they have completed … prerequisites that Abba does not require of non-disabled, working applicants." *Id.* at 1–2.

### A. *Plaintiffs' FHA Claims*

#### 1. *Statutory Framework*

The purpose of the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Supreme Court has stated that "[t]he language of the Act is broad and inclusive," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), and the Second Circuit has held that the provisions of § 3604 should be given "broad and liberal construction," *Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir.1994). Plaintiffs bring claims under four provisions of the FHA, 42 U.S.C. §§ 3604(c), (d), (f)(1)–(2). The Court first addresses Plaintiffs' claims under 42 U.S.C. §§ 3604(d), and (f)(1)–(2), which rely on a disparate impact analysis, and then proceeds to examine their remaining § 3604(c) claim.

#### 2. *42 U.S.C. §§ 3604(d), (f)(1)–(2)*

■ Plaintiffs rely on a disparate impact analysis to establish their FHA claims under 42 U.S.C. §§ 3604(d), (f)(1)–(2). Pls.' Br. at 31. Section 3604(d) makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for … rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d). Section 3604(f)(1) makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." *Id.* § 3604(f)(1). Section 3604(f)(2) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling … because of a handicap." *Id.* § 3604(f)(1). None of these provisions make it unlawful to discriminate on the basis of a person's lawful source of income.

■ Disparate impact analysis focuses on the potential discriminatory effects of facially neutral policies, *Tsombanidis v. W. Haven Fire Dept.*, 352 F.3d 565, 574 (2d Cir.2003), in this case, Abba and MA's policies regarding prospective tenants' sources of income. To establish a prima facie case under a disparate impact theory, a plaintiff must show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* at 574–575 (internal quotations omitted). "When establishing that a challenged practice has a significantly adverse or disproportionate impact on a protected group, a plaintiff must prove the practice actually or predictably results in … discrimination." *Id.* at 575 (internal quotations omitted). A showing of discriminatory intent is not necessary to establish a prima facie case.

*Id.* "If a plaintiff makes a prima facie showing, the burden shifts to the defendant to prove that its actions furthered, in theory and in practice, a legitimate, bona fide ... interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (internal quotations omitted).

■ The Court finds that Plaintiffs have failed to make a prima facie case of disability discrimination under the FHA. "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Id.* at 575. In cases of fair housing disparate impact claims, statistical evidence is normally used to show that the neutral policy in question imposes a "significantly adverse or disproportionate impact" on a protected group of individuals. *Id.; see also Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir.1988). Here, Plaintiffs have not presented any statistical evidence. Nor have they shown that Defendants' income or employment requirements significantly or disproportionately impact persons with disabilities.

■ The evidence suggests that both MA and Abba treat persons with government rental subsidies differently than other prospective tenants. At the behest of the landlords with which it works, MA generally will not assist prospective tenants unless they either earn forty to fifty times the monthly rent or have a guarantor that earns eighty to ninety times the monthly rent. FF ¶¶ 51–52. Likewise, per landlords' instructions, certain apartments listed by Abba are only available to "working people." FF ¶¶ 39–40, 47. However, Plaintiffs have offered no evidence that these policies disproportionately affect persons with disabilities.

The fundamental flaw in Plaintiffs' FHA disparate impact analysis is that it conflates disability, which is a protected status under the FHA, with source of income, which is not. Defendants' policies may have a disproportionate impact on persons with government rental subsidies. However, not all persons with government rental subsidies are disabled. There are a number of government assistance programs, including the U.S. Department of Housing and Urban Development's Section 8 program, which are available to non-disabled persons. *See* 24 C.F.R. § 982.201. Further, not all persons with a disability rely on government rental subsidies to pay their rent. As Plaintiffs have offered no statistical evidence concerning the correlation between disability and source of income, the Court cannot conclude that Defendants' policies and practices have a disproportionate effect on persons with disabilities.

Accordingly, the Court finds for MA and Abba on Plaintiffs' FHA claims which rely on a disparate impact theory, specifically, Plaintiffs' claims under 42 U.S.C. §§ 3604(d), (f)(1)–(2).

### 3. *42 U.S.C. § 3604(c)*

Plaintiffs also bring a claim against Abba under 42 U.S.C. § 3604(c), which makes it unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

This claim, unlike Plaintiffs' other FHA claims, does not rely on a disparate impact theory.

Plaintiffs assert that Abba's agents, and thus Abba itself, violated § 3604(c) by making a number of statements indicating that certain rental properties were not available to persons on HASA and other government assistance programs. For example, Plaintiffs assert the following statements by Ms. Rofeim violated § 3604(c):

- "Because nowadays the landlords have had so much grief from HASA client [sic], that a lot of them don't even want to accept this program ... But [they're] willing to do it if they see client is good." Pls.' Br. at 40; FF ¶ 39.

- "This [apartment] is probably for working [people]." Pls.' Br. at 40; FF ¶ 40.

- "Yes, yes, yes," in response to an FHJC tester's question: "So, some of the properties you have do take it [HASA], and some don't ...?" Pls.' Br. at 40; FF ¶ 30.

Plaintiffs also target Ms. Peña's statement to Mr. Short that "some apartments are for working people ... and some are for program people," along with similar statements referenced in Mr. Short's testimony. Pls.' Br. at 40; FF ¶ 25.

■ In determining whether a statement runs afoul of § 3604(c), courts adopt an "ordinary listener" standard. *Soules v. U.S. Dept. of Hous. & Urban Dev.*, 967 F.2d 817, 824 (2d Cir.1992). That is, courts inquire whether a statement would suggest to an ordinary listener that a particular protected class is preferred or not preferred for the housing in question. *Id.* An ordinary listener hears statements in context and "is neither the most suspicious nor the most insensitive of our citizenry." *Id.; see also Mancuso v. Douglas Elliman LLC*, 808 F.Supp.2d 606, 625 (S.D.N.Y. 2011).

■ Plaintiffs' § 3604(c) claim fails because the challenged statements do not indicate a preference based on any of the protected categories identified in the statute. Ms. Rofeim's statements, as well as the other statements targeted by Plaintiffs, relate to "working people" and persons on HASA or other government assistance programs. However, source of income is not a protected class under § 3604(c) or any other provision of the FHA.

■ Plaintiffs suggest that Abba's statements about HASA indicate an impermissible preference with respect to disability, which is a protected category under § 3604(c). It is true that a person must be disabled and living with AIDS to qualify from HASA. FF ¶ 6. However, in light of the context, an ordinary listener would not construe the statement that a certain property only accepts working people and does not take HASA to mean that the property is generally unavailable to persons with AIDS or other disabilities. The fact that Abba's agents interchangeably used the terms "HASA" and "program," which could refer to any number of government subsidies available to nondisabled persons, further undermines Plaintiffs' claim. *See, e.g.*, FF ¶ 40.

For these reasons, the Court finds for Abba on Plaintiffs' claim for disability discrimination under 42 U.S.C. § 3604(c).

## B. Plaintiffs' NYCHRL Claims

### 1. *Supplemental Jurisdiction*

■ Although the Court has dismissed all of the federal claims at issue in this action, it has the discretion to retain jurisdiction over Plaintiffs' supplemental state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court "*may* decline to exercise supplemental jurisdiction" where "[it] has dismissed all claims over which it has original jurisdiction" (emphasis added)); *Va-*

*lencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003) (use of the term "may" indicates that § 1367(c) "is permissive rather than mandatory"). The Court elects to retain supplemental jurisdiction. Since the parties and the Court have already devoted substantial time, effort, and resources to a four-day bench trial on this matter, declining to exercise jurisdiction and sending the case to state court for additional proceedings would be unfair, inconvenient, and a waste of judicial resources. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996) (supplemental jurisdiction appropriate where federal claims dismissed only nine days before trial); *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994) (supplemental jurisdiction appropriate where federal claims dismissed after thirteen-day trial).

### 2. *Statutory Framework*

 Like the FHA, the NYCHRL prohibits housing discrimination on the basis of disability. N.Y. City Admin. Code § 8–107(5)(c). Unlike the FHA, the NYCHRL also prohibits discrimination on the basis of a person's lawful source of income. *Id.* In relevant part, the NYCHRL provides that real estate brokers and their agents may not (1) refuse to rent or negotiate the rental of housing accommodations on account of a prospective tenant's disability or lawful source of income, or (2) make any inquiry which expresses any discrimination as to disability or lawful source of income:

> It shall be an unlawful discriminatory practice for any real estate broker, real estate salesperson or employee or agent thereof:
>
> (1) To refuse to sell, rent or lease any housing accommodation … to any person or group of persons or to refuse to negotiate for the sale, rental or lease, of any housing accommodation … to any

> person or group of persons because of the actual or perceived … disability … or because of any lawful source of income of such person or persons … or to represent that any housing accommodation … is not available for inspection, sale, rental or lease when in fact it is so available, or otherwise to deny or withhold any housing accommodation … from any person or group of persons because of the actual or perceived … disability … or because of any lawful source of income of such person or persons….
>
> (2) … [T]o make any record or inquiry in connection with the prospective … rental or lease of any housing accommodation … which expresses, directly or indirectly, any limitation, specification or discrimination as to … disability … or any lawful source of income … or any intent to make such limitation, specification or discrimination.

*Id.*

The New York City Council enacted the Local Civil Rights Restoration Act (the "Restoration Act") in 2005 to clarify the scope of the NYCHRL, which the Council found "ha[d] been construed too narrowly to ensure protection of the civil rights of all persons covered by the law." N.Y.C. Local Law No. 85 (2005). The Restoration Act provides that similarly worded federal and state civil rights laws are "a floor below which the [NYCHRL] cannot fall, rather than a ceiling above which the local law cannot rise." *Id.* As amended by the Restoration Act, the NYCHRL now states that its provisions "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y. City

Admin. Code § 8–130. The NYCHRL expressly contemplates liability for real estate brokers such as MA and Abba. N.Y. City Admin. Code § 8–107(5)(c).

### 3. *Disability Discrimination*

Plaintiffs' NYCHRL claims for disability discrimination, which rely on a disparate impact analysis, are essentially identical to their disparate impact claims under the FHA. *See* Pls.' Br. at 45. Both sets of claims fail for same reasons. As Plaintiffs point out, the provisions of the FHA constitute "a floor below which the [NYCHRL] cannot fall, rather than a ceiling above which the local law cannot rise." N.Y.C. Local Law No. 85 (2005). However, even a broad reading of the NYCHRL cannot save Plaintiffs' claims for disability discrimination. As set forth in Section III.A.2 above, Plaintiffs have offered no statistical or comparable evidence which would suggest that MA and Abba's policies regarding government rental subsidies would have a disproportionate impact on persons with disabilities. Accordingly, the Court finds for MA and Abba on Plaintiffs' NYCHRL claims for disability discrimination.

### 4. *Source–of–Income Discrimination*

The Court reaches a different conclusion with respect to Plaintiffs' NYCHRL claims for source-of-income discrimination. The NYCHRL makes it unlawful for "real estate brokers," such as MA and Abba, or their agents "to refuse to negotiate for the sale, rental or lease, of any housing accommodation ... to any person ... because of any lawful source of income of such person."

Courts generally apply the so-called *McDonnell Douglas* burden-shifting analysis to such discrimination claims, whereby a plaintiff must first make out a prima facie case and the burden then shifts to the defendant to come forward with a legitimate business justification for the challenged practice. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This test is intended to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). However, "[t]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* To avoid the burden-shifting analysis, "the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 61 (2d Cir.1997). Plaintiffs have met that burden here.

▮ There is direct evidence that the availability of most, if not all, of the rental units advertised by MA is dependent upon a prospective tenant's source of income. The evidence clearly shows that MA, at the behest of landlords, refused to assist Mr. Short because he was on HASA. MA's agent, Mr. Salsberry, initially informed Mr. Short that MA had plenty of available one-bedroom apartments in Mr. Short's price range. FF ¶ 49. However, when Mr. Short revealed that he was on HASA, Mr. Salsberry told him that "100 percent" of the landlords that listed properties with MA did not accept rental-assistance programs. FF ¶ 50. This account is undisputed and corroborated by the FHJC testing. MA's agents offered to assist the FHJC testers who represented that they were employed, nondisabled, and had no need for government rental subsidies. FF ¶¶ 53, 61. On the other hand, FHJC testers who represented that they had a family member receiving a HASA subsidy were informed that MA did not work with any landlords that accepted HASA. FF ¶¶ 53, 57–60. Moreover, as a discovery sanction, the Court designated the fact that multiple

landlords instructed MA not to assist persons with government housing subsidies. FF ¶ 62. The evidence shows that MA did not alter or amend such directives, FF ¶ 63, and that MA's formal policy was that an applicant could only qualify for an apartment if he or she earned forty to fifty times the monthly rent or had a guarantor. FF ¶¶ 51–52.

There is also direct evidence that Abba, per the instructions of landlords, refused to show HASA clients certain apartments because those apartments were not available to persons with HASA or other government rental subsidies. When Mr. Short inquired about available apartment listings in Abba's office window, Abba's agents, Ms. Rofeim and Ms. Peña, informed him that the listings were only for working people and were not available to "people on programs." FF ¶¶ 24–26. Mr. Short's account is again corroborated by the FHJC testing and audio recordings. Abba's agents offered to show apartments to testers who gave no indication that they were on HASA or any other type of government assistance. FF ¶¶ 33, 37. However, testers had a much different experience when they represented that they were looking for an apartment on behalf of a disabled relative on HASA. FF ¶¶ 36, 39–40. Ms. Rofeim told one of these testers that she would have to see whether a property would accept a HASA subsidy. FF ¶ 36. Ms. Rofeim told another tester that a particular apartment was "not for programs." FF ¶¶ 39–40. She made this statement shortly after Mr. Golowinsky, another Abba agent, showed a non-disabled tester that same apartment or a similar apartment in the same building. FF ¶¶ 37–38.

Abba argues that the *McDonnell Douglas* burden-shifting test should apply because Plaintiffs have failed to meet their prima facie case, let alone produce a smoking gun. Abba Br. at 22–23. Abba suggests that Plaintiffs were required to produce statistical evidence to support their source of income claims. *See id.* But statistical evidence is not necessary where, as here, Plaintiffs have produced direct evidence of discrimination. Specifically, Plaintiffs produced audio recordings of Abba's agents stating that certain apartments were not for "programs," "people on programs," or for HASA clients. FF ¶¶ 36, 39–40. There is nothing equivocal or ambiguous about these statements. Abba's agents were admitting, on tape, that these properties discriminated based on source of income. Abba's argument appears to conflate Plaintiffs' claims for disability discrimination and source-of-income discrimination. The Court agrees that Abba's statements regarding HASA and other government rental subsidies do not constitute direct evidence of disability discrimination. However, in the context of Plaintiffs' claims for source-of-income discrimination, such evidence is not just a "thick cloud of smoke," it is a smoking gun.

Abba also argues that the FHJC testing is too flawed to support a claim for direct discrimination because the testing failed to account for a variety of other distinctions between HASA clients and what it refers to as "market-rate clients." *See* Abba Br. at 17–21. For example, market-rate clients are often able to put cash down immediately on an apartment, while HASA clients must often wait up to twenty business days to be approved for an apartment. FF ¶¶ 14, 46. Thus, Abba reasons, market-rate clients might be preferred, not because of their source of income, but because they can move in and start paying rent immediately. Abba Br. at 19–20. Abba contends that the FHJC should have somehow controlled for this factor. *Id.*

Plaintiffs respond that allowing realtors and landlords to discriminate against persons with government rental subsidies based on the administrative burdens associated with those subsidies would effectively nullify the NYCHRL's source-of-income provisions. Pls.' Br. at 46. Plaintiffs contend that if the City Council had intended to carve out an exception for bureaucratic delay and other administrative burdens, then it would have done so. *Id.* Plaintiffs also argue that "[d]ealing with [the HASA] bureaucracy has its pros and cons," and that Abba's argument highlights the "cons" and ignores the "pros," such as direct-vendor rent checks from the government on behalf of clients like Mr. Short. *Id.* at 47; *see also* FF ¶ 10.

Plaintiffs' interpretation of the NYCHRL source-of-income provisions is more persuasive than Abba's. The City Council was clearly aware of the bureaucratic delays associated with HASA and other government rental subsidies when it passed the source of income law in 2008, since the City Council set the general processing period for certain city services, including HASA lease approvals, in 1997. *See* N.Y. City Admin. Code § 21–128(c)(2); FF ¶ 14. Nevertheless, the City Council declined to carve out an exception for bureaucratic delays or other administrative burdens. This omission, in conjunction with the City Council's declaration that the NYCHRL be construed "liberally for the accomplishment of [its] uniquely broad and remedial purposes," N.Y. City Admin. Code 8–130, clearly favors Plaintiffs' interpretation. *See also Cales v. New Castle Hill Realty,* 10 CIV. 3426 DAB, 2011 WL 335599, at *5 (S.D.N.Y. Jan. 31, 2011) ("[L]andlords and agents cannot avoid liability for refusing to participate in government housing programs by claiming that the terms of or burdens imposed by a voucher program are undesirable.").

The Court does not hold that there are no circumstances under which a landlord or realtor may prefer a so-called free-market client over a HASA client or a person receiving government rental assistance. The Court need not explore such circumstances here because of the scope of Abba's statements regarding HASA. Abba's agents did not tell Mr. Short or the FHJC testers that they were ineligible for certain apartments because those apartments were available immediately and HASA applications would take too long to process. Nor did they say that certain properties were more likely to be rented to persons who could put down cash immediately. Rather, Abba's agents indicated that certain apartments did not accept programs under any circumstances because they were only for working people. *See* FF ¶¶ 24–25, 39–40. Such broad and sweeping statements are direct evidence of a violation the NYCHRL's provisions concerning source-of-income discrimination, no matter how broadly or narrowly those provisions are construed.[10]

---

10. Abba also argues that HASA clients are different than other prospective tenants because (1) HASA only pays 50 percent of the broker's fees, (2) HASA uses a voucher to pay for clients' security deposits, and (3) HASA does not accept preferential rent riders. Abba Br. at 19–20. The first two HASA policies are irrelevant with respect to Mr. Short since they did not take effect until April 1, 2011, well after Mr. Short concluded his dealings with Abba and MA. *See* FF ¶ 12. Further, there is no indication that HASA clients (or their family and friends) are prohibited from paying the broker's fee and security deposits themselves. The evidence suggests that Abba's policies categorically exclude all HASA clients from certain apartments, even those HASA clients that would be able to pay the full broker's fee and security deposit. The issue of preferential rent riders is irrelevant since there is no indication that any of the apartments at issue had preferential rents, and, contrary to Abba's assertion, the evidence indicates that HASA generally accepts

Since Plaintiffs have proffered direct evidence of discrimination on the part of Abba and MA, the Court need not consider Abba's argument that it had a legitimate business justification for its practices. Even if Plaintiffs lacked direct evidence of source-of-income discrimination, Abba's evidence of a legitimate business justification is weak. Abba argues that the administrative burdens associated with the HASA program cost landlords money. But they have offered little evidence on the subject. No landlords testified at trial and the arguments of Abba's counsel on this matter do not constitute admissible evidence. *See* FF ¶ 47. Additionally, in cases where HASA clients, such as Mr. Short, are not looking to move into an apartment immediately, the administrative delays associated with HASA pose less of a risk to landlords. *See* FF ¶ 16.

Both Abba and MA also argue that they cannot be held liable under the NYCHRL because they were merely carrying out the instructions of landlords and conveying truthful information about these landlords' rental policies. They argue that Plaintiffs are trying to turn well-established principles of agency law on their head by holding agents responsible for the wrongdoing of their principles. The Court finds this line of argument unavailing.

▆▆▆▆ An action for housing discrimination is, in effect, a tort action, and ordinary tort-related vicarious liability rules apply. *Meyer v. Holley*, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). These principles provide that liability generally flows from the agent to the principal, not the other way around. *See* Restatement (Second) of Torts § 317. However, an agent is under no obligation to perform an unlawful act on behalf of

the principal. *Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556, 562 (5th Cir.1979); Restatement (Second) of Agency § 411. "It is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal." *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120–21 (7th Cir. 1974); *see also* Restatement (Second) of Agency § 343.

These principles were examined in the context of a claim for housing discrimination in *Sassower v. Field*, 752 F.Supp. 1190 (S.D.N.Y.1990). In that case, a third-party seller agreed to transfer to the plaintiffs his shares and proprietary lease in a cooperative apartment building. *Sassower*, 752 F.Supp. at 1191. The building's board of directors later denied the plaintiffs' application for the shares and lease. *Id.* The plaintiffs then brought claims under the FHA and NYCHRL against the board, as well as an attorney and officer for the board. *Id.* at 1191–92. The attorney's "duties as an officer were largely ministerial, limited to signing documents to effectuate sales and carrying out administrative tasks assigned by the [b]oard." *Id.* at 1192. The court granted the attorney's motion for summary judgment, holding that he could not be held liable for the acts of his clients unless "he took substantial steps to facilitate the discrimination itself"; "mere knowledge and approval" of the discrimination was insufficient. *Id.* at 1193. The court concluded that the attorney could not be held liable because "he did not participate in the decision to reject the application of the plaintiffs and, furthermore, had no authority as an officer of the corporation to participate in admission decisions." *Id.* at 1192. The court also rejected the plaintiffs' argument that the

---

preferential rent riders. *See id.* Finally, as set forth above, the NYCHRL source-of-income provisions prohibit discrimination on

the basis of certain administrative burdens associated with government housing programs.

attorney "allowed himself to be the conduit" for the board's spurious reasons for rejecting plaintiffs' application, reasoning that this argument amounted to "shooting the messenger for bringing bad news." *Id.* at 1193.

■ Abba and MA argue that they, like the attorney in *Sassower*, were merely messengers. However, Abba and MA's duties were more than ministerial. They not only conveyed information about landlords' policies concerning government rental subsidies, they also implemented those policies and screened prospective tenants. In most or all cases, MA refused to assist HASA clients altogether. *See* FF ¶¶ 51–52, 55–56. While Abba did work with HASA clients, it refused to show them properties owned by landlords who did not accept HASA subsidies. *See* FF ¶¶ 24–25, 39–40, 47. Thus, landlords did not need to reject HASA clients based on their source of income—Abba and MA weeded out the HASA clients before they could submit an application. Under *Sassower*, Abba and MA's actions constitute substantial assistance. They cannot escape liability merely because those actions were taken at the behest of the landlords.

For these reasons, the Court finds for Plaintiffs and against MA and Abba on Plaintiffs' claims for source-of-income discrimination under the NYCHRL.

### 5. *Source–of–Income Inquiries*

■ Plaintiffs also claim that Abba violated NYCHRL's source-of income-provisions by making inquiries of Mr. Short and the FHJC testers in connection with rentals that express a "limitation, specification or discrimination" based on lawful source of income. Pls.' Br. at 53; N.Y. City Admin. Code § 8–107(5)(c)(2). The NYCHRL allows inquiries as to membership in a protected class where such information is "necessary to obtain the benefits of a federal or state program." N.Y. City

Admin. Code § 8–107(5)(m). Further, "[i]nquiries about a protected status are permitted where the information is necessary for a legitimate purpose." *Sassower*, 752 F.Supp. at 1194.

Plaintiffs' claim is predicated on the fact that Abba employed different protocols for working with HASA and non-HASA clients. HASA clients were generally referred to Ms. Rofeim, who required that they: (1) meet with her in person at Abba's office; (2) complete an application; and (3) pass a credit check. FF ¶¶ 23, 35, 45. Ms. Rofeim generally required that HASA clients go through these steps before viewing apartments. *Id.* Prospective tenants who were not on HASA or another government rental subsidy were not subject to such requirements. FF ¶¶ 33, 37, 46. Abba generally required these clients to complete an application and pass a credit check before applying for an apartment, but the clients could view apartments before meeting these requirements. FF ¶ 46.

Abba argues that it employs special protocols for individuals receiving government benefits to ensure that it can place these individuals in housing that suits their particular needs. Abba Br. at 24. However, Abba has failed to enunciate a legitimate, non-discriminatory explanation for all of these special protocols. For example, Abba offered no cogent rationale for why Ms. Rofeim insisted that HASA clients, including Mr. Short, come into Abba's offices so that she could "physically" see them. *See* FF ¶¶ 23, 35, 42. At trial, Ms. Rofeim testified that she wanted to see HASA applicants so that she could deduce whether they were well enough to live in a walk-up apartment. FF ¶ 45. But it is not clear how Ms. Rofeim could possibly make this determination just by looking at a person.

Ms. Rofeim also suggested that these in-person visits saved HASA clients time and multiple trips. *Id.* But the evidence shows that this policy created more burdens for HASA clients, not less. The FHJC testers' experience at Abba is illuminating in this respect. When Ms. Boekelheide called Abba, posing as an employed, non-disabled person looking for apartments on behalf of herself, Abba's agent offered to meet her at an available apartment that evening. FF ¶ 33. On the other hand, when Ms. Burns visited Abba on behalf of her HASA-client son, Ms. Rofeim insisted that the son visit Abba's offices himself because she "need[ed] to see what he looks like," even though there was no indication that Abba had any apartments available for HASA clients at that time. FF ¶¶ 40, 42.

Abba also failed to offer a non-discriminatory explanation as to why it was necessary for HASA clients to complete an application and pass a credit check before viewing an apartment. *See* FF ¶¶ 45–46. Ms. Levin suggested that this practice "g[o]t the process going a little bit faster" for HASA clients, which was presumably important because their deals took to longer consummate. *See id.* However, it remains unclear why an early credit check was necessary for HASA clients when their rents were guaranteed by the city. *See* FF ¶ 9. It is also unclear how collecting this information before determining whether Abba had any available apartments would expedite a HASA client's apartment search. Further, since HASA could take up to twenty business days to approve an apartment, FF ¶ 14, any time savings resulting from this process would be marginal at best.

Thus, the evidence shows that Abba's segregated system for dealing with HASA clients expressed a "limitation, specification or discrimination" as to their source of income. For these reasons, the Court finds that Abba also violated section 8–107(5)(c)(2) of the New York City Administrative Code.

### C. *Damages*

■ Having determined that Abba and MA violated the source-of-income provisions of the NYCHRL, the Court now proceeds to determine damages. The NYCHRL allows for the recovery of compensatory and punitive damages. N.Y. Admin. Code § 8–502(a).

■ Here, Mr. Short seeks compensatory damages of $50,000—$25,000 from each defendant—for lost housing opportunities and for the emotional distress caused by Defendants' discrimination. Pls.' Br. at 59. The Court finds that $20,000—$10,000 from each defendant—is a more reasonable award. Defendants' refusal to show Mr. Short available apartments reduced his opportunity to find suitable housing and resulted in Mr. Short's prolonged stay at an unsanitary SRO. However, as MA points out, Mr. Short's economic damages are minimal since HASA paid his rent throughout the relevant period. FF ¶ 3.

With respect to damages for emotional distress, Plaintiffs primarily target Abba, claiming that its actions caused Mr. Short to feel "denigrated and shamed." FF ¶ 66; *see also* FF ¶ 67 (Short testified: "I just got through going to Abba a few months earlier . . . and then to deal with [MA] on top of it . . . . was just discouraging."). However, the record reflects that Abba made an effort to assist Mr. Short in finding suitable housing. *See* FF ¶¶ 27–29. Further, it appears that much of the emotional distress that Mr. Short experienced resulted from his alleged encounter with the landlord at the Newkirk Avenue apartment, who was in no way related to Abba. *See* FF ¶ 31.

Abba argues that Mr. Short is not entitled to any compensatory damages because Abba found him two suitable apartments to rent. Abba Br. at 29. Mr. Short lost one of these apartments because it was leased to another applicant who put down cash during the pendency of the HASA approval process, and he refused to move into the other after an altercation with the building's superintendent. FF ¶¶ 28, 31–32. But Abba cannot credibly contend that Mr. Short was completely unharmed by Abba's discriminatory conduct merely because he came close to leasing two Abba-brokered apartments. Had Mr. Short been able to view additional apartments that were otherwise off-limits to HASA clients, such as the apartments listed in Abba's office window, he may have found an apartment sooner. *See* FF ¶¶ 24–25. Further, Abba's argument does not account for Mr. Short's claims for emotional distress. Abba also suggests that any additional damages Mr. Short incurred resulted from his failure to follow-up with Abba after he rejected the Newkirk Avenue apartment. Abba Br. at 29. However, the evidence shows that Mr. Short continued to diligently search for an apartment after he and Abba stopped communicating. FF ¶ 69. In light of Abba's policies, Mr. Short cannot be faulted for choosing to solicit other brokers.

The FHJC seeks compensatory damages of $5,000—$2,500 from each defendant—for the cost of staff time it expended to: (1) respond to Mr. Short's housing discrimination complaints, (2) conduct a testing investigation to identify Defendants' discriminatory policies and conduct, (3) evaluate the information it obtained, and (4) decide how to counteract Defendants' practices. The Court finds FHJC's damage award request to be reasonable, well-documented, and consistent with the evidence presented at trial. *See* FF ¶ 21.

Mr. Short and FHJC also seek punitive damages from both Abba and MA. Punitive damages are available under the NYCHRL where the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the ... protected rights of an aggrieved individual." *Robinson v. Instructional Sys., Inc.,* 80 F.Supp.2d 203, 208–9 (S.D.N.Y.2000). The Court finds that punitive damages would be inappropriate in this case since there is no evidence of malice on the part of either MA or Abba. Further, the NYCHRL's source-of-income provisions are relatively new and neither defendant was aware of them during the relevant period. *See* FF ¶¶ 48, 65; *cf. Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 552, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (punitive damages appropriate where defendants did not claim ignorance of Title VII's requirements).

Accordingly, the Court awards Mr. Short $20,000 in compensatory damages— $10,000 from Abba and $10,000 from MA. The Court also awards FHJC $5,000 in compensatory damages—$2,500 from Abba and $2,500 from MA.

### D. *Injunctive Relief*

The NYCHRL also authorizes the use of injunctive relief. N.Y. City Admin. Code § 8–502. A pattern of discriminatory conduct is not necessary to warrant the award of injunctive relief, even one instance of discrimination can be sufficient. *See United States v. Hunter,* 459 F.2d 205, 218 n. 17 (4th Cir.1972), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). Injunctive relief should be crafted to prevent future violations and remove lingering effects of past discrimination. *United States v. Space Hunters, Inc.,* 00 CIV. 1781(RCC), 2004 WL 2674608, *8 (S.D.N.Y. Nov. 23, 2004). In light of this standard and the NYCHRL

violations discussed above, the Court finds that the injunction set forth in Section IV, *infra*, is appropriate. The injunction requires that MA and Abba not only follow the law but also implement formal non-discrimination policies and training. This relief is appropriate since Defendants currently lack any written policies or procedures regarding housing discrimination and do not offer any training to their employees on such matters. FF ¶¶ 48, 64–65.

## IV. CONCLUSION

For the foregoing reasons, the Court finds for Defendants Manhattan Apartment, Inc. and Abba Realty Associates, Inc. on each and every one of Plaintiffs' claims under the FHA. The Court also finds for Defendants MA and Abba on Plaintiffs' claims for disability discrimination under the NYCHRL. The Court finds for Plaintiffs Keith Short and Fair Housing Justice Center and against Defendants MA and Abba on Plaintiffs' claims for source-of-income discrimination under the NYCHRL.

The Court awards Plaintiff Keith Short $20,000 in compensatory damages, $10,000 from Defendant MA and $10,000 from Defendant Abba. The Court awards Plaintiff FHJC $5,000 in compensatory damages, $2,500 from Defendant MA and $2,500 from Defendant Abba.

Additionally, the Court enters the following injunction against Defendants MA and Abba:

### GENERAL INJUNCTION

Defendants and their agents, employees, and successors, and all other persons in active concert or participation with Defendants are hereby enjoined from discriminating against any person on the basis of lawful source of income, including government housing subsidies, in violation of the New York City Human Rights Law, New York Administrative Code, § 8–107 *et seq.*, in any manner, including, without limitation:

1. Denying or withholding rental apartments, or otherwise making rental apartments unavailable on the basis of lawful source of income, including by refusing to provide rental brokerage services to individuals on the basis of lawful source of income;

2. Representing to any person that an apartment is not available for inspection or rental because of lawful source of income when such apartment is in fact so available, including maintaining separate lists, inventories, databases or other separate collections of information on the basis of lawful source of income regarding the availability of housing;

3. Discriminating in the terms or conditions of rental because of lawful source of income, including imposing more onerous conditions on persons who have a housing subsidy in any stage of the process of providing rental brokerage services (including, but not limited to, before informing clients of available apartments, before showing such apartments, etc.);

4. Making any record or inquiry in connection with the prospective rental of housing that expresses, directly or indirectly, any limitation, specification or discrimination as to lawful source of income;

5. Making, printing, or publishing any statement with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of lawful source of income.

### NON–DISCRIMINATION POLICY

The following provisions shall go into effect within thirty (30) days of the date of this Order:

1. Defendants shall each adopt a written non-discrimination policy that prohibits discrimination in housing in violation of the New York City Human Rights Law, New York Administrative Code, § 8–107 *et seq.* by their agents and employees and that includes a list of all of the specific protected characteristics covered by these laws, including disability and lawful source of income.

2. Defendants shall provide Plaintiff FHJC with a copy of the non-discrimination policy within ten (10) days of its adoption.

3. Each Defendant shall post its non-discrimination policy on any website it maintains and distribute the policy to all employees and agents by e-mail.

*FAIR HOUSING TRAINING*

1. Within ninety (90) days of the date of this Order, each Defendant shall contract with a third party to provide the following three (3) hour fair housing training programs to be conducted by a third-party, not the Defendants, acceptable to the Plaintiffs. The training shall include informing individuals of their duties and obligations under a) this Order, b) the Defendants' non-discrimination policy; and c) the New York City Human Rights Law, New York Administrative Code, § 8–107 *et seq.*

2. The persons required to attend the training described above shall include the owners of the Defendant corporations, Defendants' employees whose job duties relate to the rental of apartments, including obtaining and disseminating information about rental listings, and Defendants' associate brokers and sales persons.

3. Each person who attends the training described above shall sign a certification indicating that he or she has received, read, and understood Defendants' non-discrimination policy and has attended the training.

4. The training shall be conducted at Defendants' expense. Defendants shall retain all training verifications signed by trainees for the length of this Order.

5. Within thirty (30) days of commencing employment with Defendants, each new employee with job duties related to the rental of apartments, and associate brokers and sales persons, shall be given a copy of Defendants' non-discrimination policy and be required to sign a certification indicating that he or she has received, read, and understood the policy.

Defendants MA and Abba shall be bound by the terms of this injunction for a period of three years.

IT IS SO ORDERED.